UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

IN THE MATTER OF                    )
                                    )    CAUSE NO.  1.25-mj-337-MJD
THE EXTRADITION OF                  )
                                    )
                                    )    **FILED UNDER SEAL**
EDGAR JAVIER BENITEZ-RUBIO          )
                                    )

**MEMORANDUM OF EXTRADITION LAW AND REQUEST
FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to the Republic of Chile

("Chile"), respectfully requests that the fugitive in this case, Edgar Javier BENITEZ-

RUBIO ("BENITEZ-RUBIO"), be held without bond pending the hearing on the

certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*.  This

memorandum summarizes the framework of extradition law in the United States and

sets forth the reasons why BENITEZ-RUBIO should be detained.  In short, BENITEZ-

RUBIO should be detained because he cannot overcome the strong presumption against

bail in international extradition cases.  Specifically, he cannot meet his burden of

showing that he is neither a flight risk nor danger to the community and that special

circumstances warrant his release.

**BACKGROUND**

Chile seeks the provisional arrest, with a view towards extradition of BENITEZ-

RUBIO so that he may be prosecuted for one (1) count of Criminal organization in

violation of article 293 of the Chilean Criminal Code ("CCC"), one (1) count of kidnapping

with homicide in violation of article 141 in connection with article 15 of the CCC, and one

(1) count of receiving stolen property in violation of article 456 bis of the CCC.  On

January 10, 2025, Judge Carlos Cesar Moreno Briones of the 11th Guarantee Court of Santiago issued a warrant for BENITEZ-RUBIO's arrest, and he was formally charged with these crimes on February 14, 2025. The warrant remains valid and enforceable. BENITEZ-RUBIO is accused of committing these offenses within the jurisdiction of Chile.

Chile's request for a provisional arrest presents the following facts as the basis for the arrest warrant and charges. The facts were developed based on a review of phone record call logs, WhatsApp message conversations, security camera footage, and statements from at least two confidential witnesses:

<u>Los Piratas Kidnap and Murder of Ronald Leonardo Ojeda Moreno</u>

On information and belief, BENITEZ-RUBIO operated as a member of a Santiago, Chile-based cell of the Venezuelan transnational criminal organization Tren de Aragua.[1] The local cell called itself "Los Piratas" (the Pirates). Chilean federal law enforcement (in Spanish, Policía de Investigaciones de Chile, "PDI") investigated the February 21, 2024, kidnapping and murder of Ronald Leonardo Ojeda Moreno ("Ojeda," or "the victim") in Santiago and determined that the Pirates may be involved. Ojeda was a former Venezuelan military officer, turned critic of the Venezuelan government. Chile granted Ojeda lawful status to live in Chile.

At 3:15 a.m., on February 21, 2024, Ojeda was taken from his apartment in Independencia, Santiago by three men dressed in PDI uniforms and tactical body armor. The incident was captured on security cameras and attested to by apartment complex staff, Ojeda's wife, and a convicted co-conspirator. The three men used a battering ram

---

[1] As of January 20, 2025, Tren de Aragua has been designated as a Foreign Terrorist Organization by executive order. *See*, Exec. Order No. 14157, 90 FR 8439, 2025 WL 315847(Pres.)

2

to break down the door to Ojeda's apartment, handcuffed him, took his two cellphones, and forced him downstairs in the elevator.

According to security camera footage, the kidnappers escorted Ojeda against his will to a grey 2020 Nissan Versa automobile, with license plate LWVD.14. According to the convicted co-conspirator, who was waiting outside in a separate car, the Nissan Versa broke down soon after leaving the scene, and Ojeda was moved into a different vehicle. Police found the Nissan Versa with the license plate LWVD.14, abandoned on the Costanera Norte highway, km. 20, in the commune of Renca. Police discovered a bulletproof vest with PDI's logo, a black helmet, a gun clip with 14 bullets, and one shoe inside the vehicle. Close to the vehicle, the police found the victim's two cellphones, which were later identified by his wife.

Acting on an anonymous tip, Chilean law enforcement discovered Ojeda's body approximately one week later on March 1, 2024, roughly 20 kilometers from the site of his abduction. He had been placed in a suitcase, buried under cement, and according to a forensics analysis, was covered in lime to speed up decomposition. According to the autopsy report, Ojeda's body showed signs of having been tortured, and the cause of death was ruled as asphyxiation by suspension.

On April 11, 2024, Chilean law enforcement arrested three individuals, including Yolvi Gonzalez Arcaya ("Gonzalez Arcaya"), who were allegedly involved in the homicide of a police officer the day before, on April 10, 2024. Police seized their phones and conducted extensive lawful analysis of their phone records, messages, and WhatsApp conversations. The communications revealed that members of Tren de Aragua's Pirate cell, led by Carlos Franciso Gomez Moreno, a.k.a. "Carlos Bobby," and Rafael Enrique

Gamez Salas, a.k.a. Adrian Rafael Gamez Finol, a.k.a "Turko" ("Finol"), received instructions from their leadership of Tren de Aragua to kidnap and later kill Ojeda.

To this end, on or about February 10, 2024, Finol created a WhatsApp text message group that included Gonzalez Arcaya, Johnny Jose Lopez Mendoza, a.k.a. "Mudo" ("Lopez Mendoza"), and others. This text message group was verified through analysis of multiple participants' communications, including Gonzalez Arcaya. On or about February 11, 2024, Finol messaged the group indicating that Tren de Aragua leadership had confidence in him to move forward with Ojeda's kidnapping and murder and that the individuals carrying out the crime would do so while disguised as PDI officers. Gonzalez Arcaya was tasked with obtaining the bulletproof vests with "PDI" emblazoned on them. Based on an analysis of Gonzalez Arcaya's cell phone, on or about February 14, 2024, he took a photograph of himself dressed in a black bulletproof vest with PDI letters, beige pants, and tactical shoes. Chilean law enforcement further determined through analysis of Gonzalez Arcaya's communications, physical evidence left in the Nissan, and a confidential witness, that Lopez Mendoza was amongst the six individuals that physically carried out the kidnapping of Ojeda.

<u>BENITEZ-RUBIO's Role</u>

Through its review of security video footage, phone records, and testimony from a confidential source, police identified BENITEZ-RUBIO as the individual who provided the vehicle that was used during Ojeda's kidnapping and murder. After recovering the abandoned 2020 grey Nissan Versa with license plate LWVD.14 and analyzing the vehicle's VIN number, Chilean law enforcement determined that the Nissan Versa had been stolen on February 3, 2024. Authorities believe that, sometime between

February 3, 2024, and February 14, 2024, BENITEZ-RUBIO took possession of the Nissan Versa with the license plate LWVD.14 unlawfully affixed to the vehicle. Chilean law enforcement obtained security camera footage showing BENITEZ-RUBIO driving the vehicle on or about February 14, 2024.

While reviewing security camera footage from February 12, 2024, related to a separate double kidnapping and homicide, police determined that the Nissan with the license plate LWVD.14 was parked outside of an apartment complex where the separate double kidnapping and homicide occurred. Police first detected the as-of-then-unidentified driver of the Nissan on security video taken on February 14, 2024, at the same building as the February 12, 2024 double kidnapping and homicide. Looking back at security video from the complex from February 21, 2024, police noticed that the same individual who had been driving the Nissan, had entered a specific apartment in the complex. Police identified the woman who rented the apartment, who told them that she in turn subleased it to an individual named BENITEZ-RUBIO. The woman identified BENITEZ-RUBIO in the video of February 21, 2024, who matched the individual driving the Nissan with license plate LWVD.14. The woman also provided police with BENITEZ-RUBIO's phone number, +56948721163.

On February 19, 2024, at 4:45 p.m., BENITEZ-RUBIO is seen in security camera footage providing the keys to the Nissan Versa with license plate LWVD.14 to an unidentified person. The vehicle is next seen on video surveillance at 3:05 a.m. on February 21, 2024, arriving at Ojeda's apartment building carrying the kidnappers dressed in Chilean PDI tactical gear.

On May 22, 2024, Chilean law enforcement spoke with a protected witness who police confirmed personally knows BENITEZ-RUBIO. The protected witness likewise provided +56948721163 as BENITEZ-RUBIO's phone number (the same number the person who subleased an apartment to BENITEZ-RUBIO provided). The witness also showed police photographs of BENITEZ-RUBIO from his/her WhatsApp profile. The witness identified BENITEZ-RUBIO as the person depicted in a clear profile photograph for the WhatsApp account. The witness also provided a separate photograph of BENITEZ-RUBIO that showed a visible tattoo on his arm. The witness also told Chilean law enforcement that BENITEZ-RUBIO had several vehicles he claims to have bought and sold, but the witness said he doubted BENITEZ-RUBIO could afford to purchase the vehicles because he never worked a stable job long enough to legitimately afford one. The witness said that the vehicles belonging to BENITEZ-RUBIO included a dark grey Nissan. The witness further revealed that, seemingly without provocation, he/she received a message from BENITEZ-RUBIO months after the murder stating that he had nothing to do with Ojeda's murder.

Once the police had a verified phone number for BENITEZ-RUBIO, they were able to uncover multiple conversations between BENITEZ-RUBIO and individuals involved in Ojeda's kidnapping and murder. For example, on February 21, 2024, just hours after Ojeda was abducted, BENITEZ-RUBIO held a joint video call with Gonzalez Arcaya (who obtained the bulletproof vests and belonged to the WhatsApp group chat) and Lopez Mendoza (one of the kidnappers who abducted Ojeda); the nature of the discussion is unknown. Based on a lawful search of Gonzalez Arcaya's phone, Chilean authorities determined that, on February 23, 2024, BENITEZ-RUBIO messaged Gonzalez Arcaya

and told him that he loved him like a brother and that he was leaving Chile because the police were searching for him. He cautioned Gonzalez Arcaya to flee as well. BENITEZ-RUBIO told Gonzalez Arcaya that the police had come to his apartment, but his doorman alerted him, allowing him to escape. Gonzalez Arcaya asked BENITEZ-RUBIO if the police were searching for him because of his car, and BENITEZ-RUBIO confirmed that the reason he was wanted by police was because of his car.

The offenses with which BENITEZ-RUBIO is charged are provided for in article 2 of the U.S. - Chile Extradition Treaty[2].

On February 11, 2025, BENITEZ-RUBIO was detained by Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations. He is currently in ICE custody and may be found within the jurisdiction of this Court in Marion County Prison, Indianapolis.

Accordingly, Chile requested that BENITEZ-RUBIO be extradited pursuant to its extradition treaty with the United States. The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for BENITEZ-RUBIO's arrest. This Court issued the arrest warrant for BENITEZ-RUBIO on April 4, 2025. (Dkt. 2) BENITEZ-RUBIO is currently detained at the Marion County Detention Center, 2960 Prospect Street, Indianapolis, IN 46203.

---

[2] Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Chile, U.S.-Chile, June 5, 2013, T.I.A.S. No. 16-1214 ("the Treaty").

## ARGUMENT

## I.    LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A.    The limited role of the Court in extradition proceedings

The extradition process is *sui generis*.  Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge."  18 U.S.C. § 3184.  The Secretary of State, and not the Court, then decides whether the fugitive should be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; *Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Matter of Extradition of Noeller*, No. 17-CR-664, 2018 WL 1027513, at *6 (N.D. Ill. Feb. 23, 2018) (quoting *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997)).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law— have been established.  *See Eain*, 641 F.2d at 508 (summarizing extradition procedure). If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court and must commit the fugitive to the custody of the U.S. Marshal to await

the Secretary's final determination regarding surrender.  18 U.S.C. § 3184 (following certification, the extradition judge "shall issue [a] warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made"); *see also Venckiene v. United States*, 929 F.3d 843, 849 (7th Cir. 2019) ("If the judge finds that these [certification criteria] have been satisfied and the accused is extraditable, the judge *must* certify the extradition to the Secretary of State.") (emphasis in original).

**B.    The requirements for certification**

The Court must certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.  *See*, *e.g.*, *Venckiene*, 929 F.3d at 849-50; *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019); *Matter of Extradition of Ortiz*, 444 F. Supp. 2d 876, 881-82 (N.D. Ill. 2006).  The following sections briefly discuss these requirements.

1.    <u>Authority over the proceedings</u>

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such, the judicial officer conducting the extradition hearing prescribed by Section 3184 does not exercise "any part of the judicial power of the United States," *In re Extradition of Kirby*, 106 F.3d 855, 866 (9th Cir. 1996), but rather is acting in a

"non-institutional capacity by virtue of a special authority," *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993). Both magistrate judges and district judges may render a certification under 18 U.S.C. § 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *Matter of Extradition of Lebiedzinski*, 20-CR-842, 2021 WL 5232735, at *2 (N.D. Ill. Nov. 10, 2021) ("[F]ederal magistrate judges are specifically included among the judicial officers authorized by the extradition statute to consider extradition."); *see also In re Mazur*, No. 06-M-295, 2007 WL 839982, at * 1 (N.D. Ill. Mar. 25, 2007) (explaining that the Old General Rule 1.70(b)(1)(j) specifically authorized magistrates to hear foreign extradition cases and that its replacement, Local Criminal Rule 5.1, "though not as specific as the old rule, nonetheless authorizes magistrate judges to perform the duties spelled out in § 3184.").

### 2.   Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as BENITEZ-RUBIO, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3.   Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also U.S. v. Nolan*, 651 F. Supp. 2d 784, 790 (N.D. Ill. 2009) (noting that "[e]xtradition is only proper where, as here, there is a treaty in force between the requesting country and the United States"). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from

an attorney in the Office of the Legal Adviser for the U.S. Department of State attesting that there is a treaty in full force and effect between the United States and Chile. The Court must defer to the Department of State's determination in that regard. *See Nolan*, 651 F. Supp. 2d at 793; *see also Matter of Extradition of Carr,* No. 20-CR-370, 2020 WL 6447385, at *6 (N.D. Ill. Nov. 3, 2020).

          4.    <u>Crimes covered by the Treaty</u>

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Here, the Treaty provides for the extradition of individuals "sought by the authorities in the Requesting State for prosecution or for imposition or service of a sentence for an extraditable offense." Treaty art. 1. As relevant here, the Treaty provides that an offense "shall" be extraditable if it is punishable under both U.S. and Chilean law "by deprivation of liberty for a maximum period of more than one year or by a more severe penalty." Id. art. 2(1). Consequently, in assessing whether the crimes for which extradition is requested are covered by the Treaty, the court will examine the description of criminal conduct provided by Chile in support of its charge and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. *See, e.g.*, *DeSilva v. DiLeonardi*, 125 F.3d 1110, 1114 (7th Cir. 1997); *see also Ortiz*, 444 F. Supp. 2d at 883 ("In assessing the duality of the crimes charged in an extradition proceeding, the Court may refer to either the federal or state law of the United States."). The requesting country need not establish that its crimes are identical to ours. *DeSilva*, 125 F.3d at 1113 ("If there is probable cause to believe that [the fugitive and his co-conspirators] committed a crime in Canada, and there is

probable cause to believe that the conduct would have been criminal if committed in the United States, then extradition is appropriate.   This is the 'dual criminality' requirement.").  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *see also* Treaty Annex, Article 2(3)(a).  As long as "the acts of the accused are considered criminal in both nations, extradition follows even if the requesting country does not have a criminal statute analogous to the one that makes the acts criminal in the United States." *DeSilva*, 125 F.3d 1113.

In fulfilling its function under Section 3184, the Court should liberally construe the Treaty in order to effectuate its purpose, namely the surrender of fugitives to the requesting country. *Factor v. Laubenheimer*, 290 U.S. 276, 298-300 (1933); *see also, e.g.*, *Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) (en banc) ("default rule" is that any ambiguity in extradition treaty must be construed in favor of "facilitat[ing] extradition").  Accordingly, because extradition treaties should be "interpreted with a view to fulfill our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981).

### 5.    Probable cause that the fugitive has committed the offense

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crime charged by Chile was committed by the person before the Court. *See Eain*, 641 F.2d at 508.  Probable cause is established if it would

cause a "prudent man" to "believ[e] that the [suspect] had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The standard "applicable to an extradition hearing is the same as the standard used in federal preliminary hearings," meaning "the magistrate's role is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Noeller*, 922 F.3d at 803 (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

## C.    An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive, as that determination is reserved for the foreign court. *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Noeller*, 922 F.3d at 804; *see also Noeller*, 2018 WL 1027513, at *7 ("It cannot be too often repeated that the core limitation applicable in extradition hearings in federal court is that an extradition proceeding is not a trial. Questions of credibility and guilt or innocence are not to be considered."). Accordingly, an extradition hearing is not a criminal proceeding, *see, e.g.*, *DeSilva v. DiLeonardi*, 181 F.3d 865, 868 (7th Cir. 1999),

13

and it is governed by "the general extradition law of the United States and the provisions of the Treaty," *Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1450-51 (9th Cir. 1987).

Accordingly, the Federal Rules of Evidence do not apply to extradition proceedings. Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see also, e.g.*, *Noeller*, 922 F.3d at 804; *Bovio v. United States*, 989 F.2d 255, 259 n.3 (7th Cir. 1993). Indeed, hearsay evidence is admissible at an extradition hearing, and a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Collins*, 259 U.S. at 317; *Bovio*, 989 F.2d at 259. Nothing more is required, and typically nothing more is provided. *See, e.g.*, *Eain*, 641 F.2d at 509 (sworn witness statements is competent evidence); *Matter of Extradition of Schumann*, No. 18-CR-283, 2018 WL 4777562, at *5 (N.D. Ill. Oct. 3, 2018) ("In the extradition context the court may rely on evidence summaries presented by public prosecutors to support a probable cause finding, even where they reflect multi-level hearsay."). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. *See Matter of Extradition of Jarosz*, 800 F. Supp. 2d 935, 937 (N.D. Ill. 2011) ("[H]earsay is routinely and of necessity a staple in extradition cases."). Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to this case. Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); *see also Noeller*, 922 F.3d at 804. A fugitive has no

automatic right to discovery. *See*, *e.g.*, *Jarosz*, 800 F. Supp. 2d at 940 ("a relator has no right to discovery or to cross-examine witnesses"); *Matter of Extradition of Lebiedzinski*, 20-CR-842, 2021 WL 916082 (N.D. Ill. Mar. 10, 2021) (denying fugitive's motion for discovery because the Court lacked authority to order discovery from a foreign country and because the type of discovery sought exceeded the permissible scope of the extradition proceeding); *cf. Mazur*, 2007 WL 839982, at *6 ("Although there is no explicit statutory basis for ordering discovery in extradition proceedings, the extradition court has the inherent power," within its "discretion," "to order such discovery procedures as law and justice require.") (internal quotation marks and citation omitted).

Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see, e.g.*, *Jarosz*, 800 F. Supp. 2d at 940; there is no Sixth Amendment right to a speedy trial, *see, e.g.*, *Ortiz*, 444 F. Supp. 2d at 885 (internal citations omitted), *accord DeSilva,* 181 F.3d at 868 ("the Sixth Amendment does not apply to extradition"); the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, e.g.*, *Collins*, 262 U.S. at 429; *Ortiz*, 444 F. Supp. 2d at 885 (citing *In re Extradition of Powell*, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998)); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517; *In re Extradition of Fulgencio Garcia*, 188 F. Supp. 2d 921, 933 (N.D. Ill. 2002).

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the

requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton v. Kelly*, 229 U.S. 447, 461-62 (1913); *Noeller*, 922 F.3d at 804; *Eain*, 641 F.2d at 512; *Ortiz*, 444 F.Supp. 2d at 884 ("[A fugitive] can offer evidence that explains the requesting country's proof, but he cannot submit evidence that contradicts it."). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)); *see also Jarosz*, 800 F. Supp. 2d at 940-41 ("Recognizing the right of the accused to have a plenary hearing and trial in the United States would compel the demanding government to produce all of its evidence on American soil" which "would be contrary to the desiderata of all extradition treaties."). The admission of explanatory evidence is largely within the discretion of the Court. *See*, *e.g.*, *Matter of Extradition of Markey*, 3:09-mj-75, 2010 WL 610975, at *3-4 (N.D. Ind. Feb. 18, 2010).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry

All matters raised by the fugitive as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186; *see also Venckiene*, 929 F.3d at 849. The Secretary may take into account humanitarian claims and applicable statutes,

treaties, or policies regarding appropriate treatment in the requesting country. *See*, *e.g.*, *Venckiene*, 929 F.3d at 849 (citing *Noeller*, 922 F.3d at 808) ("The executive branch has sole authority to consider issues like the political motivations of a requesting country and whether humanitarian concerns justify denying a request."). Similarly, a fugitive's contention that the extradition request is politically motivated, or that the requesting state's justice system is unfair, should be addressed by the Secretary of State, not the Court. *Venckiene*, 929 F.3d at 849; *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991). This is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *See In re Kaine*, 55 U.S. 103, 110 (1852).

## II.    BENITEZ-RUBIO SHOULD BE DETAINED

Just as extradition hearings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.[3] *See*, *e.g.*, *Matter of Extradition of Molnar*, 182 F. Supp. 2d 684, 687 (N.D. Ill. 2002); *Markey*, 2010 WL 610975, at *1. Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of

---

[3] The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, BENITEZ-RUBIO is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with an offense committed in violation of the law of Chile.

justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

### A.    Applicable law

1.    <u>A strong presumption against bail governs in an international extradition proceeding</u>

Unlike in domestic criminal cases, there is a "long-standing presumption against bond in extradition proceedings." *See, e.g.*, *Matter of Extradition of Noeller*, 17-CR-664, 2017 WL 6462358, at *3 (N.D. Ill. Dec. 19, 2017); *United States v. De Loera*, No. 2:06-MJ-98, 2006 WL 1518981, at *2 (N.D. Ind. May 31, 2006); *cf. Molnar*, 182 F. Supp. 2d at 686-87 (noting that the Bail Reform Act's presumption in favor of bail does not apply to extradition proceedings). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. 40, 62 (1903).

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding interest in complying with its treaty obligations" to deliver the fugitive. *In re Extradition of Garcia*, 615 F.

Supp. 2d 162, 166 (S.D.N.Y. 2009); *see also Wright*, 190 U.S. at 62. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See United States v. Howells*, No. 20-CR-50033, 2020 WL 6822980, at *1 (N.D. Ill. Nov. 20, 2020) (citation omitted) ("If the United States were to release a foreign fugitive pending extradition and the defendant absconded, the resulting diplomatic embarrassment would have an effect on foreign relations and the ability of the United States to obtain extradition of its fugitives.").

    2.    <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives "face a high burden in extradition cases, and courts only infrequently grant bail." *Howells*, 2020 WL 6822980, at *1 (internal citation omitted). Specifically, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *Matter of Extradition of Budrys*, 19-MJ-179, 2019 WL 1958566, at *2 (N.D. Ill. May 2, 2019) (holding that a lack of flight risk and dangerousness is a "precondition" to establishing bail eligibility in the existence of "special circumstances"); *see also Molnar*, 182 F. Supp. 2d at 687 ("Whether defendant is, or is not, a risk of flight is not a matter that falls within the ambit of 'special circumstances' determinations."); *Matter of Extradition of Rouvier*, 839 F. Supp. 537, 539 (N.D. Ill. 1993) ("Only the presence of

special circumstances will justify the granting of bail.").[4]  "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act."  *Matter of the Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense.  *See, e.g.*, *Howells*, 2020 WL 6822980, at *2 ("given the potential for substantial penalties attached to these alleged crimes, the Court is not willing to conclude that Defendant is not a flight risk"); *In re Extradition of Patel*, 08-430–MJ–HUBEL, 2008 WL 941628, at *2 (D. Or. Apr. 4, 2008) (considering the fact that a fugitive, a physician, had "more than sufficient assets available with which to flee").  Crucially, the special circumstances inquiry is separate from considerations of risk of flight or danger to the community.  *See, e.g.*, *Molnar*, 182 F. Supp. 2d at 687.  Accordingly, a fugitive who poses a flight risk or danger to the community should be denied bail, even in the face of special circumstances.  *See, e.g.*, *Budrys*, 2019 WL 1958566, at *2; *Noeller*, 2017 WL 6462358, at *7.

In addition, "[s]pecial circumstances must be extraordinary and not factors applicable to all defendants facing extradition."  *Noeller*, 2017 WL 6462358, at *4 (citing *Matter of Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992)).  Courts have considered and rejected a lengthy list of would-be special circumstances, including:

---

[4] There is "a split in authority regarding whether an extradition defendant must establish 'special circumstances' by a preponderance of the evidence or by clear and convincing evidence." *Carr*, 2020 WL 4816052, at *3  n.1. (citing, *e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1088 (C.D. Cal. 2010) (recognizing a split but not deciding it)).  The Seventh Circuit has not yet weighed in, but this Court need not decide the issue here because bail is unwarranted under either standard.

- The complexity of the pending litigation, *see*, *e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *Carr*, 2020 WL 4816052, at *6-7;

- The fugitive's need to consult with an attorney or participate in pending litigation, *see*, *e.g.*, *Smyth*, 976 F.2d at 1535-36; *Howells*, 2020 WL 6822980, at *3;

- The fugitive's character, background, or ties to the community, *see*, *e.g.*, *Noeller*, 2017 WL 6462358, at *5; *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Sidali*, 868 F. Supp. 656, 658 (D.N.J. 1994);

- The fact the fugitive may have been living openly, *see*, *e.g.*, *Schumann*, 2018 WL 4777562, at *6; *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see*, *e.g.*, *Noeller*, 2017 WL 6462358, at *8-9; *Matter of Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1301-02 (S.D. Fla. 2017); *In re the Extradition of Kyung Joon Kim*, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see*, *e.g.*, *Carr*, 2020 WL 4816052, at *6; *Matter of Extradition of Antonowicz*, 244 F. Supp. 3d 1066, 1072 (C.D. Cal. 2017); *Matter of Knotek*, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see*, *e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581-82 (W.D. Mich. 1991) (highly-trained doctor);

- The availability of electronic monitoring, *see*, *e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see*, *e.g.*, *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989); *Antonowicz*, 244 F. Supp. 3d at 1070;

- The availability of bail for the same offense in the requesting country, *see*, *e.g.*, *Carr*, 2020 WL 4816052, at *3-4; *Antonowicz*, 244 F. Supp. 3d at 1070; *Kyung Joon Kim*, 2004 WL 5782517, at *2;

- The availability of nonfrivolous defenses, *Carr*, 2020 WL 4816052, at *6; and

- The COVID-19 pandemic and related health and convenience concerns, *see, e.g.*, *Howells*, 2020 WL 6822980, at *3; *Carr*, 2020 WL 4816052, at *5.

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.    Analysis

The Court should detain BENITEZ-RUBIO without bond because he cannot meet the "high burden" to overcome the presumption against release. *Howells*, 2020 WL 6822980, at *1. In particular, BENITEZ-RUBIO is a flight risk. As an initial matter, "a fugitive charged with crimes in another country is by definition in flight or deliberately absent from that jurisdiction, and the fact that the fugitive has evaded prosecution in [that] country is indicative of his risk of flight were he to be released on bond here." *Noeller*, 2017 WL 6462358, at *3. Indeed, "there is no meaningful distinction between a person who left a country when he learned of pending charges and one who already outside that country refuses to return to face these charges. The intent is the same—the avoidance of prosecution." *Id.* (citations omitted); *see also United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985).

BENITEZ-RUBIO is facing charges in Chile, which carry a significant penalty and create a substantial incentive for him to flee. Furthermore, BENITEZ-RUBIO has proven that he is a flight risk as he fled to the United States from Chile. *See Howells*, 2020 WL 6822980, at *2; *see also In re Extradition of Adame*, Misc. H-13-287, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear

at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"); *see also, e.g.*, *In re Extradition of Shaw*, No. 14–MC–81475, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Accordingly, allowance of bail in any amount would not guarantee BENITEZ-RUBIO's presence in court and would invite the possibility of embarrassing the United States in the conduct of its foreign affairs.

In addition to being a flight risk, BENITEZ-RUBIO is a danger to the community and should be denied bail for that reason. The serious nature of taking part in such a violent terrorist group as Tren de Aragua and the violent nature of the homicide and kidnapping that he is accused of participating in, indicate that BENITEZ-RUBIO poses a serious danger to the community both here, in the United States, and abroad if he were released from custody. See, e.g., Perez-Cueva, 2016 WL 884877, at *3 (seriousness of allegations against fugitive "militates against release on bail").

That BENITEZ-RUBIO is a flight risk is sufficient for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that BENITEZ-RUBIO is not a flight risk, the government is unaware of any "special circumstances" that would justify bail in this case. Should, however, the Court be inclined to grant bail, the government respectfully requests that the Court submit written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its

treaty obligations to Chile, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

## III.    CONCLUSION

For the foregoing reasons, the United States requests that BENITEZ-RUBIO be detained pending resolution of this extradition proceeding.

Dated: April 4, 2025                              Respectfully submitted,


                                                  JOHN E. CHILDRESS
                                                  Acting United States Attorney

                                    By:    _/s/ Cristina Caraballo-Colón_
                                                  Cristina Caraballo-Colón
                                                  Assistant United States Attorney

24